## KOTTEMANN v. GROSS.
### No. 1901.

Court of Appeal of Louisiana.
First Circuit.

Nov. 17, 1938.

Jos. A. Loret, of Baton Rouge, for appellant.

Breazeale & Sachse, of Baton Rouge, for appellee.

DORE, Judge.

The defendant employed the plaintiff to work in his office as architectural draftsman for one year for which he agreed to pay plaintiff $100 per month for the first six months and $125 per month for the remainder of the time. Plaintiff worked the first six months and was paid $50 on the first and middle of each month. The first six months' period expired on October 1, 1937; plaintiff continued to work for the first half of October, and claims that defendant refused to allow him the increased pay which, according to plaintiff, was equivalent to a discharge. He sues to recover $750 for the last six months of the employment at $125 per month.

The defendant denies that he discharged plaintiff, but alleges that plaintiff became angry in an argument between them concerning an incident that occurred and voluntarily left his job and did not return or offer to return to his work. The defendant denied that he refused to pay plaintiff according to the contract.

The trial judge rejected plaintiff's demand and dismissed his suit. Plaintiff has appealed.

The version given by plaintiff of the occurrence that led to, or at least accompanied, the severance of his connection with defendant is about as follows: About the middle of October he went to defendant to get the check which was due him on that date for his half month's salary and asked for his check; that defendant took the check, already written out and in the drawer of a desk, and handed it to the plaintiff; that he (plaintiff) saw that the check was for only $50, the amount he had been getting for the past six months; that he then reminded defendant that he was entitled to a raise under the contract; and defendant, who was about to leave the office, told him that he wanted to see him (plaintiff) about the matter when he came back. Plaintiff says that from what defendant did and said, he

got the impression that the defendant did not intend to give him the raise provided by the contract; that after defendant left the office, he (plaintiff) began to look for a copy of the contract which he thought he had seen in a drawer of defendant's desk. When defendant returned to the office in a few minutes, he found plaintiff looking for this contract, whereupon defendant upbraided him for going into his private desk without permission. An argument began about plaintiff looking in defendant's private desk, plaintiff explaining his acts in that respect by stating that he had previously gotten papers out of this desk with defendant's knowledge and consent, and he did not think the desk was private. Plaintiff then continues his testimony on this point as follows:

"I asked him if he intended to pay me the raise that the contract called for and he asked me if I thought I was worth a raise. I told him that I certainly did. He said, 'Well, I don't think you are'. I told him it was merely a matter of opinion; that we had a contract, and I expected him to pay me the amount of money that the contract called for, and he told me that he was willing to keep me at the same salary he had been paying me for the first six months, but that he did not intend to pay me the raise at all. When he told me that, I told him I did not intend to work for the same salary that he had paid me the first six months, and he told me if I thought I was worth more to somebody else than he was paying me during the first six months that I could try to find another job. So I asked him again about the contract and I told him that we had a contract and that he had to fulfill it. He laughed very sarcastically and stated, 'You don't think I would tie my hands behind my back, do you?' When he said that, I told him I did not know whether the contract was good or not, but that I intended to find out and if it was good I would make him pay. To that he replied that I could try to do it, and he asked for the key to the office and I gave him the key and I picked up a few things that I had in the drafting room and left."

The defendant gives a similar account of the occurrence as plaintiff up to the time defendant left the office; but he says on his return to the office, he found plaintiff rifling his private papers in his desk, and he asked plaintiff what he was looking for, to which plaintiff replied that he was looking for the contract; an argument then followed about plaintiff going into defendant's private papers, during which plaintiff told him that he had this contract and he was going to make defendant pay. The defendant replied to plaintiff by asking him if, under the circumstances of his looking through defendant's private papers, he thought he was entitled to an increase in salary; after which defendant's testimony continued as follows:

"He said to me, 'Yes, I am.' He said, 'If you don't give me the increase, I am going to make you pay it to me.' I said, 'Of course that is your privilege. Do just as you want about that,' and we spoke a little bit more, a few words,—I don't remember just what they were—and he said to me, 'Well, I won't work for you for $100 a month, and I guess you would like to have me, wouldn't you?' I said, 'Not necessarily. Just use your own good judgment about that,' and he walked out of the office then and went into the drafting room and started packing his papers together— he had no tools or equipment to work with —he just started packing his papers together. He went toward the drawer and came back and gave me the key. He said, 'Here is the key to your office.' From that day I have had no business with Mr. Kottemann.

"Q. Did you ask Mr. Kottemann to give you the key? A. No, I didn't.

"Q. Did you ever decline to pay Mr. Kottemann the additional amount that was due that day on his salary? A. I did not. In fact, I had gone back to the office in order to make the check good. I generally went to lunch about that time.

"Q. Why was it that you made the check for $50 instead for $62.50? A. I just did not think. I thought when the time came he would call my attention to the increase. He was the only steady employee I had in my office. I figured that he would attend to that and notify me when it was due."

It will be seen that there is a direct conflict in the testimony of the plaintiff and the defendant on the vital point whether or not defendant definitely refused to allow the raise in salary as he admits was provided by the contract. If he refused to pay the increase in salary as provided by the contract, his act would be tantamount to a discharge of plaintiff.

Another witness in an adjoining room some 15 feet away heard part of the ar-

382

gument about paying the increase in salary, but his testimony is not very definite on this point. This witness says on cross-examination:

"Q. Did you ever hear Mr. Grosz decline to pay or tell Mr. Kottemann he would not pay the additional $12.50 that was due that day? A. I don't remember those words.

"Q. Did you ever hear' him say it in different words? A. Not that I remember.

"Q. Did he ever say anything that you heard that indicated he was not going tó pay the additional $12.50? A. No.

"Q. Did you ever hear Mr. Kottemann ask him for the additional $12.50 due that day? A. He did not directly ask for that $12.50; he mentioned he had a contract and it should be fulfilled."

■ In view of this conflict in the testimony, we cannot say that the trial judge was in error in finding that the plaintiff had failed to prove that defendant had refused to pay the increase in salary. The dispute over the questionable conduct of plaintiff in searching the private desk of defendant for the .contract has no relevance in the case, except insofar as it might support defendant's contention that plaintiff became peeved during the argument over this matter and picked up his belongings and left of his own accord.

■ The question of whether or not the conduct of plaintiff was sufficient cause for defendant to discharge him is not before the court, as defendant does not claim that he discharged plaintiff for this cause, but, on the contrary, he contends that he never discharged the plaintiff at all. Curtis v. A. Lehmann & Co., 115 La. 40, 38 So. 887. Of course, any acts or words on the part of the employer that would reasonably lead the employee to believe that his services were no longer desired would be equivalent to sending him away before the expiration of his term, so as to permit a recovery of salary for the remainder of the term under Article 2749 of the Civil Code. Dunbar v. Orleans Metal Bed Co., 145 La. 779, 82 So. 889.

We do not find that the acts and words of the defendant in this case were such as to reasonably lead plaintiff to believe that defendant definitely and finally refused to pay the increase in salary.

For these reasons, the judgment is affirmed.